# EXHIBIT 2

**Part I**

1

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

TIMOTHY BROWNLEE,

           Plaintiff,

   vs.

VILLAGE OF BOLINGBROOK,
BOLINGBROOK POLICE OFFICER DAVI,
BOLINGBROOK POLICE OFFICER
SMETTERS, and BOLINGBROOK POLICE
SERGEANT HILLIARD,
           Defendants.

)
)
)
)
)
)
)
)
)
)

No.07 C 7085



The discovery deposition of

**OFFICER SALVATORE DAVI**, taken under oath at

312 North May, Chicago, Illinois, at

10:00 o'clock on March 25, 2008, pursuant to

the Rules of the United States District Court,

Northern District of Illinois, before

Carol M. Siebert-LaMonica, C.S.R. in and for

the County of Cook and State of Illinois,

pursuant to notice.

OFFICER SALVATORE DAVI

2

APPEARANCES:


LOEVY & LOEVY, by

MR. RUSSELL AINSWORTH

312 North May

Suite 100

Chicago, Illinois  60607


　　Appeared on behalf of the plaintiff;


TRESSLER, SODERSTROM, MALONEY & PRIESS, by

MR. CRAIG G. PENROSE

233 South Wacker Drive

Suite 2200

Chicago, Illinois  60606


　　Appeared on behalf of the defendants.

OFFICER SALVATORE DAVI

3

SALVATORE DAVI,

1

2  called as a witness herein, having been first

3  duly sworn, was examined and testified as

4  follows:

5        E X A M I N A T I O N

6  BY MR. AINSWORTH:

7       Q.   Sir, would you please state and spell

8  your name for the record?

9       A.   Salvatore Davi, S A L V A T O R E.

10  Last name Davi, D A V I.

11       Q.   And are you currently employed?

12       A.   Yes.

13       Q.   By whom are you currently employed?

14       A.   Village of Bolingbrook.

15       Q.   How long have you been employed?

16       A.   Seven and a half years.

17       Q.   Have you ever been employed by any

18  other Police Department?

19       A.   No.

20       Q.   Have you ever been employed by any

21  other law enforcement agency?

22       A.   No.

23       Q.   Are you a high school graduate?

24       A.   Yes.

10:06AM (line 10)

10:06AM (line 20)

1   situation, a string in shorts.

2                 Bottom line, no strings are

3   allowed.

4                 Also for officer safety, who

5   knows what he is doing in there, even if he is

6   on camera, to try to strangle an officer

7   walking by to do a cell check, you could reach

8   your arms through, you never know.

9         Q.   What did you charge Mr. Brownlee with?

11:16AM  10        A.   He was originally charged with

11   disorderly conduct and obstructing justice.

12        Q.   Did you charge him with any other

13   things?

14        A.   He was charged with resisting,

15   obstructing, the same statute, that is the way

16   it is worded.

17                 Resisting.  Obstructing.

18                 After the fact that he was

19   refusing to get processed and refusing to be

11:17AM  20   handcuffed to be transported to the county.

21        Q.   How many charges total did you charge

22   Mr. Brownlee with?

23        A.   That would be three charges.

24        Q.   And did you fill out the complaints

OFFICER SALVATORE DAVI

68

1    for those charges?

2        A.   What do you mean by "complaints"?

3             I fill out my arresting booking

4    form, and I filled out my reports.

5             As far as just in the charges

6    box.  We don't fill complaints out, unless they

7    are local complaints.

8        Q.   What do you mean by local complaints?

9        A.   We can charge somebody locally or we

10   can charge somebody state, depending on the

11   severity of the offense.

12            I'm not going to charge somebody

13   state littering.  Local littering and it will

14   go to our Bolingbrook field court.

15            State littering you wouldn't

16   burden the Will County courthouse with that.

17            So we have a local complaint, and

18   there is no jail time.  Like basically a fine.

19   Like getting a ticket.

20            They can -- you can get arrested,

21   the whole process is the same, but there is a

22   $50 bond, $500 ECOG, $100 cash and you have to

23   go to Joliet for it.

24            So do you understand?

OFFICER SALVATORE DAVI

92

1    dispatched to calls by ourselves, if they are

2    like a paper call, criminal damage, something

3    that's not in progress with no offenders on

4    scene is usually what we are dispatched alone

5    to.

6        Q.    How did you become aware there was

7    something going open on Wright Court on May 28,

8    2007?

9        A.    I got dispatched to a call there.

11:52AM

10       Q.    And were you in your car when you were

11   dispatched?

12       A.    I don't know.

13       Q.    Do you recall where you were in

14   Bolingbrook when you were dispatched?

15       A.    No, I cannot recall.

16       Q.    What did dispatch say you to?

17       A.    Like a neighbor dispute over on Wright

18   Court. I don't know if she gave it to me over

19   the air or if it was sent right to my terminal.

11:53AM

20   I don't know.

21       Q.    Do you have -- is it called PDT

22   terminal?

23       A.    No, we have computers, laptops. We

24   used to have MVP, I don't know if they still

OFFICER SALVATORE DAVI

93

1    call them MVP or not, but they are computers

2    now, Panasonic Tough Books.

3        Q.    Is that what you had in May of 2007, a

4    Panasonic Tough Book?

5        A.    Yes, it is my new squad, so it had to

6    be.

7        Q.    And what information do you have

8    access to in the tough book?

9        A.    You can run vehicle registration,

10   vehicle VINs, people by name, date of birth, by

11   driver's license, criminal histories, sound X,

12   gun checks, serial number checks, the

13   possibilities are endless. You can get wireless

14   internet if you had to, stuff like that.

15       Q.    Can you communicate with the

16   dispatcher over the tough book?

17       A.    Yes.

18       Q.    And is that done via some type of

19   e-mail?

20       A.    I don't know how it works.  It is sort

21   of like an instant messenger.  We can

22   communicate to each other in the squad cars and

23   to computers at the police station, also,

24   depending what you type into the terminal.

OFFICER SALVATORE DAVI

94

1    Q.    Are there cameras in the Bolingbrook

2 Police Department?

3    A.    In the department?

4    Q.    Yes.

5    A.    Yes.

6    Q.    And when I say "cameras", I mean fixed

7 cameras that are recording what is going on

8 within the department?

9    A.    Yes.

11:55AM  10    Q.    Do those cameras have audio

11 capabilities?

12    A.    I don't know.

13    Q.    Do you know if there are any rooms or

14 areas within the Bolingbrook Police Department

15 that have audio recording?

16    A.    I think a couple of our interview

17 rooms have, but I've never done an interview

18 and asked for the tape or anything like that.

19 That's the only places I know that there is

11:55AM  20 audio.

21    Q.    And what did you do when you received

22 the dispatch about the neighbor dispute?

23    A.    I went enroute.

24    Q.    Did you activate your emergency

OFFICER SALVATORE DAVI

95

1  lights?

2       A.   No.

3       Q.   Was there a reason why you didn't

4  activate your emergency lights?

5       A.   It is not an in-progress call.

6       Q.   How did you know it was not an

7  in-progress call?

8       A.   They said the neighbor left the scene.

9  Even if it was an in-progress call, I mean we

10  still wouldn't activated our lights, they wer

11  fighting, it escalated, me having to get there

12  faster.

13       Q.   Was it your understanding that it was

14  a verbal dispute between the neighbors?

15       A.   Yes.

16       Q.   You had that after you received the

17  dispatch?

18       A.   After I received the dispatch, yes.

19       Q.   Yes. But just to be clear, you

20  received that information from the dispatch?

21       A.   Right.

22       Q.   Do you know if anyone else was

23  dispatched to the scene at or about the same

24  time as you?

11:56AM (at line 10)

11:57AM (at line 20)

OFFICER SALVATORE DAVI

96

1          A.    I don't know if there was or not.

2          Q.    Did you ask for another officer to be

3    dispatched to the scene?

4          A.    I can't recall. I don't know if I did

5    or not.

6          Q.    Do you recall how long it took you to

7    arrive at the scene after your dispatch?

8          A.    No.

9          Q.    Where did you park your vehicle when

10   you arrived at the scene?

11         A.    Right in front of the complainant's

12   house.

13         Q.    Is that Four Wright Court?

14         A.    If that's what it is. Four Wright

15   Court. Mr. Pausche's house.

16         Q.    Were there any other police officers

17   at the scene when you arrived?

18         A.    No.

19         Q.    Was there anybody, any civilians

20   present outside when you arrived?

21         A.    Mr. and Mrs. Pausche were.

22         Q.    Where were they?

23         A.    It looked like they were doing yard

24   work.  They were outside in front of the house.

OFFICER SALVATORE DAVI

97

1    Q.   Was there anybody else outside in

2    front of Mr. Brownlee's house?

3    A.   No.

4    Q.   And what did you do after you parked

5    your vehicle?

6    A.   Spoke with them.

7    Q.   You spoke -- did you speak with both

8    Mr. Pausche and Mrs. Pausche together?

9    A.   They were both there. I think I was

10   speaking with him and she would interject and

11   say whatever they had to say. Yes, I was

12   speaking to both of them.

13   Q.   And were you speaking to them while

14   they were outside?

15   A.   Yes.

16   Q.   And what did they say to you and what

17   did you say to them?

18   A.   They said they had been having an

19   ongoing dispute with their neighbor, their

20   neighbors at Three Wright Court regarding a

21   bunch of issues, children on their grass, their

22   dog deficating on their grass, issues like

23   that. Mostly to do with the children.

24   Q.   Any other issues that they told you

11:59AM (lines 10)

11:59AM (line 20)

OFFICER SALVATORE DAVI

1   about that they were having with the neighbors?

2        A.   Just that would lead to the verbal

3   confrontation between the two, stuff like that.

4   And then that led to the reason why they called

5   today, is because they got into another verbal

6   altercation when they were outside, I suppose,

7   and Mr. Brownlee was driving away, and they

8   started cursing -- he started cursing at them

9   they, and they were cursing back, and they

10  become in fear, and they notified the police.

11       Q.   Did they tell you what sparked the

12  confrontation that they had on that day?

13       A.   That they had said something to his

14  kids about being on the lawn. I can't recall

15  exactly what. Or the dog pooping on the lawn or

16  something.

17            And Mr. Brownlee then said to

18  them as he was driving off:  "You got anything

19  to say, you say it to me, not my children."

20  Something to that. Not an exact quote but

21  something to that fact that he had said

22  something to them, you know, about talking to

23  him instead of talking to their children.

24            And he cursed in the process

12:00PM

12:00PM

OFFICER SALVATORE DAVI

1   which made them alarmed and disturbed to call

2   the police.

3        Q.   What curse did he say?

4        A.   I can't recall. He said -- I can't

5   recall what kind of curse was said.

6        Q.   And what curse did they say to him?

7        A.   I don't know. I just know there was

8   cursing involved, they said.

9        Q.   And based on your conversation with

10  the Pausche's, did you believe that you had

11  probable cause to charge anyone with a crime?

12       A.   No, not really.  Never biased. You

13  can't be biased. He was -- Mr. Brownlee wasn't

14  there to state his side of the story.

15            So, you know, everything --

16  without having both sides of the story or

17  independent witnesses, I mean there is not

18  enough there to get any kind of criminal

19  complaint on.  It is all hearsay.

20       Q.   So based on what they told you at the

21  first scene you didn't believe you had probable

22  cause to arrest Mr. Brownlee?

23       A.   Right. There is no probable cause

24  there to arrest at that time without getting

12:01PM (line 10)

12:02PM (line 20)

OFFICER SALVATORE DAVI

100

1    the other half of the story.

2         Q.    How long did you speak with Pausche's

3    during that first conversation?

4         A.    I don't know. It was quite sometime. I

5    couldn't give you minutes, because they just

6    wanted to keep telling me, you know, about

7    their situation.

8         Q.    Were you taking notes during your

9    conversation with them?

10        A.    No, not at that time.

11        Q.    Was there a reason why you weren't

12   taking notes of your conversation with them?

13        A.    No, there was no reason behind it. I

14   wasn't going to do a report or anything that I

15   would need to notes at that time.

16        Q.    Why weren't you going to do a report?

17        A.    Because without any kind of

18   independent witness information, we have what

19   is called a computerized report, a shift log.

20             I would have shift logged it for

21   any kind of further incidents as long as there

22   had been an incident there.

23             So that's a report per se, I

24   guess, over the computer but not an actual

OFFICER SALVATORE DAVI

1   written report.  Basically we log names and what

2   happened and coded out as handled on the scene,

3   call back if there is further assistance

4   needed.

5        Q.   Did the Pausche's tell you who their

6   neighbor was?

7        A.   I can't recall them telling me his

8   exact name, just that it was their neighbor.

9        Q.   Did the Pausche's tell you what he

10  looked like?

11       A.   They said a black guy.

12       Q.   Did they give you any further

13  description of the black guy?

14       A.   No.

15       Q.   What race were the Pausche's?

16       A.   Caucasian.

17       Q.   Did you ask the Pausche's for their

18  identification?

19       A.   No.

20       Q.   Was there a reason you didn't ask the

21  Pausche's for their identification?

22       A.   Because I was just going to log their

23  names to the report.  No need for

24  identification.

12:03PM

12:04PM

OFFICER SALVATORE DAVI

102

1        Q.   Did you run a name check on the

2   Pausche's?

3        A.   I can't recall if I did or not.

4        Q.   If you wanted to run a name check on

5   the Pausche's how would you go about doing it?

6        A.   I would get their name and date of

7   birth and if they had a middle initial I would

8   run that over the air or I could do it in my

9   computer via my computer in my car, also.

12:05PM    10        Q.   Did you get their date of birth for

11   either of the Pausche's?

12        A.   I had to have it down for the male,

13   Mr. Pausche, because he was on my report then.

14   I can't recall if I got Mrs. Pausche's

15   information or not.

16        Q.   Did you get Mr. Pausche's date of

17   birth before you wrote up the report that you

18   then -- regarding his statement?

19        A.   Which report?

12:05PM    20        Q.   The one page report that contains what

21   the Pausche's allege had happened?

22        A.   Their statement?

23        Q.   Yes.

24        A.   Their written statement?

OFFICER SALVATORE DAVI

103

1    Q.   Yes?

2    A.   I didn't write that up.  They did.

3    Q.   All right. Did you get Mr. Pausche's

4    date of birth before they wrote up their

5    statement?

6    A.   I don't know, because the bottom of

7    their statement form, their information goes at

8    the bottom, so I don't know if I got it off of

9    that or if I got it from him on scene.

10   Q.   While you were talking to the

11   Pausche's did anyone else arrive?

12   A.   Mr. Brownlee came back to the house.

13   Q.   Were you still talking to the

14   Pausche's when he arrived?

15   A.   Yes.

16   Q.   Was -- did Mr. Brownlee arrive in a

17   vehicle?

18   A.   Yes.

19   Q.   Was he driving that vehicle?

20   A.   I can't recall if he was driving or

21   not.

22   Q.   Was he with anyone else?

23   A.   He was with a female.

24   Q.   Do you know what her name is?

OFFICER SALVATORE DAVI

1    A.    I'm pretty sure her name is Tigen

2    Sandifer. T I G E N, I think is her first name.

3    But I'm not too sure. That's what I --

4    Q.    And before Mr. Brownlee arrived did

5    any other Bolingbrook police officers arrive?

6    A.    I can't remember.

7    Q.    What happened when Mr. Brownlee

8    arrived?

9    A.    I went to speak with him.

10   Q.    Why did you go to speak with him?

11   A.    Because he is the other half of this

12   call. To get his side of the story.

13   Q.    And where did you speak to

14   Mr. Brownlee?

15   A.    In his driveway.

16   Q.    Okay.  And did you ask him for his

17   identification?

18   A.    The fact, after we were talking, you

19   know, for a few minutes, I asked for his

20   identification.

21   Q.    Why did you ask him for his

22   identification?

23   A.    So I could perform a cursory check on

24   him and log him to the call, and the female I

1    also asked.

2        Q.    Why did you want to do a cursory check

3    on them and log it into the call?

4        A.    Just standard, just what I do I guess.

5        Q.    It is standard procedure to ask them

6    for their identification?

7        A.    To ask for identification or their

8    name and date of birth, which is what we do.

9        Q.    Okay.  Do you typically ask them for

10   their identification or do you ask them to

11   verbally give you their name and date of birth?

12       A.    If they don't have ID you ask them for

13   their name and date of birth.

14       Q.    What did Mr. Brownlee say to you and

15   what you did say to him before you asked him

16   for identification?

17       A.    I told him the reason why I was there,

18   the neighbors complained, the neighbor

19   complained about the children and the dog.  And

20   he had told me that this is an ongoing

21   situation with him and his kids.

22              And he told me that he did say

23   something to them that day about his children,

24   because he was making comments to his children,

OFFICER SALVATORE DAVI

106

1    and cursing at them he said towards his kids,

2    and he said if you have anything to say to me

3    say it to me, don't approach my children.

4            He told me that Mr. Pausche took

5    some kind of fecal matter, he didn't know if it

6    was dog or whatever, and put it on his front

7    porch in the past, I don't know if he generated

8    a call when that happened.

9            But just basically it was an

10   ongoing neighbor dispute between him and

11   Mr. Pausche and what happened that day when I

12   went there.

13       Q.   Did Mr. Brownlee tell you what kind of

14   cures words Mr. Pausche had been using at his

15   children on that day?

16       A.   I can't remember. I don't think -- not

17   that day, he didn't curse at his kids.

18            I think in the past he has been

19   cursing at his kids.

20            And that's what escalated to

21   where it is now, because he was yelling at his

22   kids, and then he finally came out today, and

23   was driving by and from his car he screamed to

24   him:  If you have anything to say to my

OFFICER SALVATORE DAVI

107

1    children, this isn't exact quotes now, you say

2    it to me, don't say it to my children.

3        Q.   Did Mr. Brownlee tell you that his

4    neighbor had been using racial epitats at his

5    children in the past?

6        A.   I don't remember him saying that.

7        Q.   Did Mr. Brownlee tell you that

8    Mr. Pausche had been calling his children

9    "nigger"?

10       A.   No.

11       Q.   Did Mr. Brownlee -- Strike that.

12            Did Mr. Brownlee tell you

13   anything else during that conversation?

14       A.   Like the whole conversation is what

15   you are asking, about the past and everything

16   you are saying?

17       Q.   Yes, sir.

18       A.   Yes.  No, nothing else that I can

19   remember.

20       Q.   What was Mr. Brownlee's demeanor like

21   from that conversation?

22       A.   Well, he seemed fine at first. I was

23   trying to tell him I'm there to diffuse the

24   situation.

12:11PM (line 10)
12:12PM (line 20)

OFFICER SALVATORE DAVI

108

1          I was trying to give him -- I

2    told him the same thing I told the Pausche's,

3    keep away from each other, if you guys can't

4    get along, don't have any interaction, don't

5    talk to each other.

6          If there are any issues you guys

7    have, so it doesn't get escalated call the

8    police, we will deal with it.

9          I told Mr. Brownlee just make

10   sure your kids don't go over on his lawn, and

11   watch your dog, make sure the dogs aren't going

12   over on his lawn, and stuff like that, trying

13   to diffuse the situation so everybody will be

14   happy.

15   Q.   Did you say the same kind of thing to

16   the Pausche's?

17   A.   I said if you have any issues with

18   them, don't scream over to them, don't talk to

19   their children, don't do none of that.

20          I told Mr. Brownlee, I went back

21   and forth a couple of times, and just to try to

22   tell them the same thing.

23          I said:  Mr. Brownlee is

24   requesting you speak with him, not his

OFFICER SALVATORE DAVI

1    children, if there is an issue or with -- I

2    don't know if that was his wife or girlfriend

3    or whoever, with her, and not to the children.

4             I was going, trying to

5    de-escalate both sides as we are standing out

6    there.

7        Q.    Was Tigan Sandifer standing next to

8    Mr. Brownlee when you were speaking with

9    Mr. Brownlee at first?

12:13PM  10        A.    She was there.  I don't know if she

11    stayed next to him the whole time.  She was

12    there though next to him. I don't know when

13    though.

14        Q.    Was she telling you anything about the

15    interactions between them and the Pausche's?

16        A.    Basically the same exact thing. They

17    were bouncing volleying off of each other, they

18    were both saying the same thing, saying the

19    same things to the children, about the poop on

12:14PM  20    the door step. And those same exact things.

21    Same story.

22        Q.    What happened when you asked

23    Mr. Brownlee for identification?

24        A.    He didn't produce any.

OFFICER SALVATORE DAVI

110

1    Q.    Did he say anything?

2    A.    I can't remember if he said I don't

3    have any or it is not on me. I don't know.

4    Q.    What about Tigen, did you ask her for

5    identification?

6    A.    She produced identification.

7    Q.    And what identification did she give

8    you?

9    A.    Either state ID. Some form of state ID

12:15PM 10    or Illinois Driver's License. Illinois, they

11    look the exact same. One says ID, one says

12    driver's license.

13    Q.    And how do you know Mr. Brownlee

14    didn't produce identification?

15    A.    Because I had to write his name down

16    on my note card and run it.

17    Q.    What is a note card?

18    A.    I don't carry -- I do I carry both. I

19    wrote -- not a note card, a contact card. It

12:15PM 20    has all -- they give it to new guys so they

21    know what to ask for, as far as what you need

22    for report; height, driver's license, Social

23    Security.  I write on them.  They are free and

24    easy to grab out of the squad.

OFFICER SALVATORE DAVI

111

1    Q.    Did you write Tigen's information on

2    that card?

3    A.    She gave me an ID and I ran it right

4    off of the ID.

5    Q.    And what do you mean you ran it right

6    off of the ID?

7    A.    The ID has her information, so I ran

8    her information right off of her ID.

9    Q.    What do you mean by running her

10   information?

11   A.    Oh, performed a cursory check through

12   dispatch.

13   Q.    You contacted dispatch and gave them

14   Tigen's information?

15   A.    Yes.

16   Q.    And what information did you give them

17   about Tigen?

18   A.    I don't know if I ran her by driver's

19   license number or if I ran her by name and date

20   of birth.

21        More than likely, 99% of the time

22   I run by name and date of birth, because it is

23   not a traffic related issue.

24        So there is no use in running

12:16PM (line 10)

12:16PM (line 20)

OFFICER SALVATORE DAVI

112

1    just the DL number. If they have warrants it

2    won't hit on a DL number, it will hit on a name

3    and date of birth.

4        Q.   What did you do after Mr. Brownlee

5    indicated that he didn't have ID on him?

6        A.   I asked him for his name and date of

7    birth.

8        Q.   What did he tell you?

9        A.   He told me his name was Timothy

10   Sandifer with an unknown date of birth, I can't

11   remember what date of birth he gave me.

12       Q.   But he gave you a date of birth?

13       A.   Yes.

14       Q.   Why didn't you ask the Pausche's for

15   their identification?

16       A.   Because it wasn't -- I was going to

17   log it into the call. It is my discretion

18   whether I ask for identification or not.

19            We did log names to the call at

20   that time on what is going on.

21            There is no set guidelines

22   whether I have to ask them for identification

23   or if they have to produce it or if I just want

24   to get their names and date of birth.

12:17PM (line 10)

12:18PM (line 20)

1    Q.    So why did you ask Mr. Brownlee and

2    Miss Sandifer for their identification?

3    A.    Because at that time I realized I was

4    going to have to do a report.

5    And so I was going to get all of

6    their information off of their identification

7    as I was wring down taking my notes, it is

8    easier that way, so I don't have to go run it,

9    and write it off of the computer, I just write

10   down my notes that I already had.

11   Q.    What made you realize that you were

12   going to have to write a report?

13   A.    Because of the escalating situation as

14   I was standing there, they were starting to

15   yell back and forth to each other.

16   Q.    And what were they yelling back and

17   forth to each other?

18   A.    I can't remember. He was screaming,

19   and I kept on asking them to stop screaming.

20   At this time he was standing in his driveway,

21   and they are in front of their house, and they

22   are screaming over:  Ask him about this.  And

23   ask him about that.

24   I can't remember exactly what

1    they were saying.

2           I kept on saying.  I will come

3    talk to you in a second.  I will come talk to

4    you in a second.

5           And sometime during this whole

6    time Officer Smetters arrived so we could

7    branch off, and he could -- I can't remember

8    when he got there, you know.

9       Q.   Let me break that up.

10           You said you are standing in his

11    driveway, who's driveway?

12       A.   I'm sorry.  In Mr. Brownlee's

13    driveway.

14       Q.   When you said that they were yelling:

15    Ask him about this or ask him about that, who

16    was yelling?

17       A.   Mr. and Mrs. Pausche were yelling.

18           (Recess.)

19

20

21

22

23

24

OFFICER SALVATORE DAVI

115

BY MR. AINSWORTH:

1

2      Q.   Were either of the neighbors swearing

3  at each other in your presence?

4      A.   Yes, some curse words. They were both

5  swearing back and forth to each other.

6      Q.   What swear words did you hear them

7  saying to each other?

8      A.   I don't know. I don't know. They are

9  with cursing though.

12:24PM  10         I can't remember the specific

11  swear words.  I'm sure they said them all.

12      Q.   Why did you run Miss Sandifer's name,

13  date of birth over the radio rather than going

14  back to your vehicle and doing it through the

15  tough book?

16      A.    It was just more convenient.  I was

17  already standing out there. The air was clear.

18  There was no -- if there is too much radio

19  traffic we are not suppose to run stuff over

12:24PM  20  the air.

21      Q.   Did you run Timothy Sandifer's name?

22      A.   Yes.

23      Q.   And what information did you get back

24  about Tigen Sandifer?

OFFICER SALVATORE DAVI

116

1      A.   The female?

2      Q.   Yes. Tigen?

3      A.   I can't remember.  I'm assuming she

4   was clear valid, because if she had a warrant

5   she would have been placed under arrest.

6      Q.   What about Timothy Sandifer, what

7   information did you get back on him?

8      A.   It came back as no record.

9      Q.   And where were you when you realized

10  it was coming back no record?

11     A.   I was standing right, you know, where

12  I am speaking with him. Speaking distance.

13     Q.   Did you say anything to him about the

14  fact that his name came back no record?

15     A.   No.

16     Q.   Was there a reason why you didn't say

17  anything to him about his name coming back no

18  record?

19     A.   Because I was just going to do my

20  report and get out of there. Because it was

21  just going to be an information report, and I

22  was going to document names and get out of

23  there.

24          But things were -- because the

SIEBERT & ASSOCIATES COURT REPORTERS, INC.
(773) 851-7779 (FAX) 773 625-7254

OFFICER SALVATORE DAVI

—117

1    more I stood there the more escalated things

2    were going, so I was trying to de-escalate and

3    diffuse the information as much as I could.

4                I was getting as much information

5    for my reports as I could.

6        Q.   When his name came back no record did

7    that raise any suspicion with you?

8        A.   Yes.

9        Q.   What suspicion did it raise?

10       A.   That he is lying.

11       Q.   Why did you think he was lying?

12       A.   Because somebody of his age, you know,

13   saying he has an ID or -- it has been my

14   training and experience that when people who

15   come back no record, they are lying about their

16   name for countless reasons.

17       Q.   And how have you established that

18   people who come back no record are lying about

19   their name for countless reasons?

20       A.   Because it has happened to me

21   countless times, where somebody has lied

22   because they have a warrant or they are

23   suspended or they just didn't want you to know

24   who they were because they thought they had a

12:26PM (line 10)

12:26PM (line 20)

OFFICER SALVATORE DAVI

118

1    warrant.

2         Q.   Did Mr. Brownlee have a warrant?

3         A.   No.

4         Q.   Did Mr. Brownlee have a suspended

5    license?

6         A.   It didn't come back no that he didn't.

7         Q.   Did Mr. or Mrs. Pausche -- Strike

8    that.

9                   Did you ever run Mr. or

10   Mrs. Pausche's name over the air?

11        A.   I don't think -- I can't remember if I

12   did or not, after the fact or if I ran them

13   over my NDT to get the information for the

14   report. I don't know whether I did or not.

15        Q.   Do you know one way or another whether

16   you ever ran their name?

17        A.   I don't know.

18        Q.   Is one reason that you didn't run

19   their name because they didn't appear to you to

20   be a threat?

21        A.   No.

22        Q.   What did you do after you received the

23   information on Mr. Brownlee's name came back as

24   no record?

OFFICER SALVATORE DAVI

119

1    A.   Him going under Mr. Sandifer and

2  coming back no record?

3    Q.   Yes.

4    A.   None.  I went back to my patrol squad,

5  because, you know, he was becoming irritated

6  with me and things weren't going right, so I

7  told them stay away from them, you guys stay

8  away from them.

9            Mr. Pausche stay away from

10 Mr. Brownlee, Mr. Sandifer at that time.

11           Mr. Sandifer stay away from

12 Mr. Pausche and keep your kids off his lawn,

13 and I wanted to get out of there.

14   Q.   At the point that's when you went back

15 to your car, did you have any reason to believe

16 that probable cause existed to arrest anyone on

17 the scene?

18   A.   That's what I was going to find out by

19 finding out what his real name is.

20   Q.   How would finding out Mr. Brownlee's

21 real name indicate to you whether there was

22 probable cause to arrest anyone?

23   A.   Because when I found out his real name

24 a crime had been committed right there,

OFFICER SALVATORE DAVI

120

1    obstructing justice, that's probable cause to

2    arrest him.

3        Q.   So up until the time that you found

4    out that Mr. Brownlee's name was Brownlee, you

5    didn't have any probable cause to arrest either

6    Mr. Brownlee or anybody else at the scene?

7        A.   Correct.

8        Q.   Did you have any conversation with

9    Mr. -- with Officer Smetters about the fact

10   that Timothy Sandifer's name was coming back

11   "no record"?

12       A.   No, I guess I assumed that he picked

13   it up. I don't know if he did or not. I didn't

14   talk to him about it.

15       Q.   Did you tell Mr. Brownlee your name is

16   coming back no record, might I have inputted it

17   wrong?

18       A.   Yes.  Are you asking if I asked him if

19   I inputted it wrong?

20       Q.   Yes.

21       A.   No, because I ran the name he gave me

22   right in front of him. He was within earshot,

23   he could hear the name that I was running.

24       Q.   How do you know that he was within

12:29PM

12:30PM

1   earshot?

2      A.   I don't know.  I guess I don't know. I

3   guess him standing, you know, a few feet from

4   me. I thought he could hear me.

5      Q.   How far was he standing from you when

6   you ran his name?

7      A.   I couldn't give you -- I didn't have

8   no tape measure so I can't give you the exact

9   distance, but enough to create a safe barrier

10   if anything happened. Enough I could hear him

11   talk, and he could hear me talk.

12      Q.   Can you estimate how far away from you

13   he was?

14      A.   I don't know. I don't want to give you

15   an incorrect estimation.

16      Q.   Well, was he closer to you or further

17   to you than the court reporter is, as she is

18   sitting there?

19      A.   I don't know.

20      Q.   Was he closer to or further from me

21   where I am sitting from, away from you?

22      A.   I don't know.

23      Q.   So your intent when you went back to

24   your car was just to create a log report and

12:30PM

12:31PM

OFFICER SALVATORE DAVI

122

1    get out of there?

2        A.   No, it wouldn't have been a log report

3    at that time because of the problem.  And after

4    you have been on the street for a certain

5    amount of years, you can sometimes assume that

6    there may be a problem later, and it is better

7    if you write it up just in case something

8    happens later, any kind of altercation or

9    somebody gets hurt later or damage to cars, so

10   that way a patrol officer coming in on the next

11   shift gets dispatched there, he has previous

12   knowledge something happened there, and these

13   are the people involved. That's the whole point

14   of writing it up.

15       Q.   Had you taken a statement from either

16   neighbor up to that point?

17       A.   No. Like I said there wasn't going to

18   be a criminal report, we were just getting

19   information on what occurred that day.

20       Q.   What did you do with the contact card

21   that you wrote Mr. Brownlee's name on?

22       A.   I don't know.

23       Q.   You do still have that contact card?

24       A.   I don't think so. Because I go through

12:31PM

12:32PM

OFFICER SALVATORE DAVI

123

1    so many of them I end up throwing them away.

2         Q.   Do you know if you through away

3    Mr. Brownlee's contact card?

4         A.   I don't know. I may have it. I mean I

5    don't know.

6              I usually -- once they get old,

7    I've written on them so many times with

8    different names on there and stuff like that I

9    end up throwing them away.

10        Q.   If you did have it, where would it be?

11        A.   It could be in my locker at work or

12   that's -- if I saved it, that is the only place

13   it could be. But I wouldn't save it, because I

14   don't.

15        Q.   Did Mr. Brownlee tell you that he

16   lived at Three Rye Court?

17        A.   Yes.

18        Q.   Did the Pausche's also say he lived at

19   Three Rye Court?

20        A.   Yes.

21        Q.   Do you have any reason to believe he

22   didn't live at Three Rye Court at the time you

23   are speaking to Mr. Brownlee?

24        A.   No.

12:32PM (line 10)
12:33PM (line 20)

OFFICER SALVATORE DAVI

124

1    Q.    What happened when you got back to

2  your squad?

3    A.    I started forming what's called a

4  sound X and contacts on that name through

5  dispatch. I called them over my cell phone. So

6  I didn't tie up the air or I may have talked

7  over there either way.

8    Q.    And did you -- what was your purpose

9  for doing the sound X on the name?

12:34PM 10    A.    To find out if the name he was giving

11  me was the truth.

12    Q.    Was this sound X different from when

13  you ran the name in front of him?

14    A.    No, it is just a different format. It

15  is the same information he gives me, I just ran

16  that in a different format.

17    Q.    Was there a reason why you didn't use

18  the tough book to do the sound X?

19    A.    Probably because I was lazy. I don't

12:34PM 20  know. I just -- I could do one thing and

21  dispatch could do another, multiple reasons why

22  I could have ran it one way or not the other

23  way.

24    Maybe they are just better at it

OFFICER SALVATORE DAVI
125

1    than I am, as far as the computer stuff,

2    because most of most of the time I run stuff

3    over the air. There is no set guidelines on how

4    I do stuff.

5         Q.    And what came back on the sound X?

6         A.    I can't recall.

7         Q.    Was there any record?

8         A.    It doesn't work that way. A sound X is

9    different. A sound X hits on a name.

10              It can give you 200 Timothy

11   Sandifer's.  I just have to match it up, if it

12   is a real name.

13              Then we run contacts.  Contacts

14   are did anybody else have a contact with a

15   Timothy Sandifer.

16              Because sometimes that will be --

17   we do that with juveniles, unless they have

18   been arrested, until they get a license will

19   not have contacts, will not have a record,

20   because they don't have a driver's license

21   through the State of Illinois or any other

22   state. So they will come back no record.

23              So you ask for contacts. We had

24   contact with them in '05 for possession -- I'm

OFFICER SALVATORE DAVI

126

1    giving you examples, that's why we do the

2    contacts, sound X, stuff like that.

3        Q.    In general terms do you recall what

4    the result was when you ran the Timothy

5    Sandifer name through sound X?

6        A.    No, I can't recall.

7        Q.    What did you do after you ran the

8    Timothy Sandifer name through sound X?

9        A.    I think I had dispatch run contacts on

10   him.

11       Q.    And what happened when dispatch ran

12   the contacts on him?

13       A.    I don't know. I don't think we had any

14   contacts with him.

15       Q.    And what did you do after that?

16       A.    I started running the license plates

17   in the driveway on the vehicles that were

18   parked in the driveway.

19       Q.    How many vehicles were parked in the

20   driveway?

21       A.    Two in the driveway.

22       Q.    And what happened when you ran the

23   license plates?

24       A.    One came back to a Timothy Brownlee. I

12:36PM (line 10)

12:36PM (line 20)

OFFICER SALVATORE DAVI

127

1    think at Three Rye Court. I don't know what

2    address was attached to that.

3        Q.   Were the neighbors still outside

4    yelling at each other when -- while you were

5    doing the sound X and asking for the contacts?

6        A.   I don't know where Mr.and Mrs. Pausche

7    were. I can't remember if they were outside or

8    not still. Mr. Brownlee and Mrs. Sandifer went

9    inside.

12:37PM 10    Q.   And what happened when you ran --

11    sorry. One of them was registered to a Timothy

12    Brownlee?

13        A.   Correct.

14        Q.   What did you do when you found out one

15    of them was registered to a Timothy Brownlee?

16        A.   I went back up to the door and

17    questioned him about his name, knocked on the

18    door and he came down and talked to me, came

19    outside.

12:38PM 20    Q.   What was your demeanor like when you

21    went up to the door to talk to him?

22        A.   I asked him about his name again. I

23    said:  Your name isn't Timothy Sandifer, it is

24    Timothy Brownlee, just like that.

OFFICER SALVATORE DAVI

128

1    Q.   By "just like that", do you mean in a

2  normal speaking tone?

3    A.   Sure.  Like I'm talking right now.

4    Q.   Were you angry?

5    A.   No.

6    Q.   Were you upset?

7    A.   No, not upset as far as like upset.

8  But I found out he lied to me.  I'm not upset.

9  I mean --

12:38PM  10    Q.   Were you yelling at him?

11    A.   No.

12    Q.   Did you raise your voice to him?

13    A.   No.

14    Q.   What, if anything, did Timothy

15  Brownlee say in response?

16    A.   He said:  So what are you going to do

17  about it?

18    Q.   And what did you say?

19    A.   I said:  You are under arrest for

12:39PM  20  obstructing justice, and I told him put his

21  hands behind his back.

22    Q.   And why did you arrest him for

23  obstruction of justice?

24    A.   Because he lied to me about his name.

OFFICER SALVATORE DAVI

129

1    Q.    Were you actually arresting him for

2    attempted obstruction of justice?

3    A.    No, because he lied to me about his

4    name.

5    Q.    And were you inside or outside of the

6    house when you told him that he was under

7    arrest?

8    A.    I was outside.

9    Q.    Where was Mr. Brownlee?

12:39PM    10    A.    Outside with me. Right on the --

11    front -- what is it called, front stoop,

12    whatever that concrete thing is, front steps to

13    the front stoop.

14    Q.    Was Officer Smetters with you when you

15    told him he was under arrest?

16    A.    I don't know.  I can't remember.

17    Q.    What did you do after you told

18    Mr. Brownlee that he was under arrest?

19    A.    Like I said I told him to put his

12:40PM    20    hands behind his back, and I placed him in

21    handcuffs.

22    Q.    Did Mr. Brownlee place his hands

23    behind his back?

24    A.    Yes.

SIEBERT & ASSOCIATES COURT REPORTERS, INC.
(773) 851-7779 (FAX) 773 625-7254

OFFICER SALVATORE DAVI

130

1      Q.  Did he turn around?

2      A.  Turn away from me to put his hands

3  behind his back?

4      Q.  Yes.

5      A.  Yes.

6      Q.  Did he allow you to cuff his hands?

7      A.  Yes.

8      Q.  Did he tighten his arms at all to

9  prevent you from cuffing him?

10     A.  No.

11     Q.  Did he pull away from you?

12     A.  No.

13     Q.  Did he say anything to you after you

14  said you are under arrest for obstruction of

15  justice?

16     A.  I can't remember if he did or not. I

17  don't know.

18     Q.  Did he ever at the scene deny that he

19  had given you a false name?

20     A.  No.

21     Q.  Did he ever tell you:  "I gave you my

22  driver's license."?

23     A.  No.

24     Q.  Did he ever tell you:  "I didn't tell

12:40PM (line 10)

12:40PM (line 20)

OFFICER SALVATORE DAVI
131

1    you my name.  I just gave you my driver's

2    license."?

3        A.   No.

4        Q.   Have you ever had somebody give you a

5    false name at their own home?

6        A.   I don't know. I don't know.

7        Q.   Can you recall any circumstance where

8    you have had somebody give you a false name at

9    their own home?

10       A.   I don't know.

11       Q.   None that you can recall?

12       A.   I can't give you an exact yes.

13            I did recall a time where

14   somebody gave me a false name at their home. I

15   don't know.

16       Q.   Can you give me a general circumstance

17   where somebody gave you a different name at

18   their own home?

19       A.   Can you rephrase that?

20       Q.   You said you can't give me an exact --

21       A.   Well, because it is happened -- I'm

22   sorry to interrupt you. Sorry about that.

23       Q.   You said you have -- you said you

24   could not give me an exact circumstance in

OFFICER SALVATORE DAVI

132

1    which it has happened.

2              I was wondering if you could give

3    me something more general than an exact

4    circumstance where it has happened that

5    somebody has given you a false name at their

6    own home?

7         A.    Sure.   It has happened many times,

8    many, many, many times.   People have warrants,

9    lie about their names all of the time.

10              Or like I explained to you

11   earlier, or suspended or want to conceal their

12   identity for who knows what reason.

13        Q.    And they have done that to you at

14   their own homes?

15        A.    I don't know if they have done it to

16   me at their own homes or not.

17        Q.    None that you can recall?

18        A.    None that I can recall.

19        Q.    What was Mr. Brownlee's demeanor like

20   when you told him his real name was Timothy

21   Brownlee and not Sandifer like he told you

22   before?

23        A.    He was arrogant and calling me out

24   like, I don't know if you understand what

1  calling me out means. Basis of saying:  "What

2  are you going to do about it?"  He was -- that

3  was his demeanor.

4      Q.   And at the time you were wearing your

5  Bolingbrook Police Department uniform?

6      A.   Yes.

7      Q.   After you handcuffed Mr. Brownlee what

8  did you do?

9      A.   I placed him in my patrol squad.

12:43PM

10     Q.   Did you search him?

11     A.   I don't know if I did or not.

12     Q.   Is there any reason why you wouldn't

13  have searched him?

14     A.   I don't know. Maybe because he wasn't

15  wearing much clothing.

16     Q.   Did he have a gun on him?

17     A.   No, he didn't.

18     Q.   How do you know he didn't have a gun

19  on him?

12:44PM

20     A.   He didn't have it we got to the

21  station.

22     Q.   At the time that you were putting him

23  in the back of your squad car did you know

24  whether or not Mr. Brownlee had a gun on him?

OFFICER SALVATORE DAVI

—134

1    A.    I don't know if I patted him down.  I

2    may have, because it is just routine for me to

3    do that, and I do it all of the time, so I

4    don't know if I did or not. I don't know if he

5    had a gun on him.

6    Q.    Any reason why you wouldn't have

7    patted him down before placing him in your

8    squad car before you arrested him?

9    A.    Didn't you already ask me that?

12:44PM  10    Q.    If I did I apologize.

11    A.    Okay.  Maybe because he wasn't wearing

12    much clothing, and that leads to bulges and

13    stuff like that.

14         So maybe I didn't think -- I just

15    wanted to get him, you know, because he was

16    being becoming more than more upset. Maybe I

17    wanted to get him in the back of that squad car

18    before anything else happened.

19         It could have been multiple

12:45PM  20    reasons, I don't know.

21    Q.    Did you feel it was safer for you to

22    have Mr. Brownlee when he was getting agitated

23    in the back of your squad car rather than

24    outside of the squad car with you?

OFFICER SALVATORE DAVI

135

1      A.   For sure, yes. For sure, yes.

2      Q.   He was more contained in the back of

3 the squad car than outside with you?

4      A.   Yes.

5      Q.   What did you do after you placed

6 Mr. Brownlee in the back of your squad car?

7      A.   I transported him to Bolingbrook

8 Police Department.

9      Q.   Was Mr. -- was Officer Smetters on the

12:45PM  10 scene?

11      A.   I don't know.

12      Q.   Do you ever recall calling into

13 dispatch to ask them to send another officer

14 while you were at the scene?

15      A.   I can't remember. I don't know.

16           You have to understand, a lot of

17 it, they do without us asking. It is just

18 police work.

19           If I am going back to talk to

12:46PM  20 somebody, maybe I don't think I need a backup

21 but they will send one anyway that I don't know

22 about.

23      Q.   Before you left the scene, did you

24 have anyone fill out a statement?

OFFICER SALVATORE DAVI

136

1       A.    No.

2       Q.    And when you arrested Mr. Brownlee

3   what were you arresting him for?

4       A.    Obstructing justice.

5       Q.    Did you go directly to the police

6   station?

7       A.    No. We had a stop on the way.

8       Q.    Why did you have to stop on the way?

9       A.    Because Mr. Brownlee was becoming

10  disruptive in the back of my squad car,

11  spitting, kicking, screaming, and he started go

12  use his cell phone.

13      Q.    What was he kicking?

14      A.    There is a wall there behind the

15  seats, metal wall, below the fiberglass

16  partition.

17      Q.    You mean when you say below the seats,

18  do you mean --

19      A.    I said behind the seats, I think. If I

20  didn't, behind the front seats, there is a

21  partition, half -- it is the plastic shield and

22  it is the metal backing below it.

23      Q.    And what was Mr. Brownlee kicking?

24      A.    The metal backing below it.

OFFICER SALVATORE DAVI

137

1      Q.   Did you think that he was going to

2   break the metal backing?

3      A.   No, I don't think so.

4      Q.   What was he screaming?

5      A.   I don't know. I can't remember.

6      Q.   Was he screaming words or was he just

7   screaming?

8      A.   He was screaming words. He was saying

9   stuff.  I can't remember.

12:48PM   10      Q.   Was he making any threats?

11      A.   I don't know.

12      Q.   Was he threatening to harm you?

13      A.   I don't know.

14      Q.   Can it be a crime to threaten a police

15   officer's bodily integrity?

16      A.   Yes.

17      Q.   Where was he spitting?

18      A.   At the partition. The plastic part.

19   The seat -- Plexiglass part.

12:48PM   20      Q.   Was the partition enclosed?

21      A.   Yes.

22      Q.   Was any of the spit hitting you?

23      A.   No.

24      Q.   Did you think any of the spit would

OFFICER SALVATORE DAVI

1    hit you?

2        A.   Well, it could. I mean there is slots

3    around the top and stuff like that, if they

4    want to be crafty and try to spit around the

5    slots.

6        Q.   Was Mr. --

7        A.   Knock on wood it never happened so

8    far.

9        Q.   Was Mr. Brownlee being crafty and

10   going up to the edges of the slots and it

11   splitting through?

12       A.   Not that I could see, no.

13       Q.   Did you feel that Mr. Brownlee was

14   going to be able to spit through one of the

15   slots and hit you?

16       A.   I don't know.

17       Q.   You don't recall feeling that

18   Mr. Brownlee was going to hit you with any of

19   the spit?

20       A.   I don't remember.

21       Q.   What was -- you mentioned something

22   about a cell phone, what was Mr. Brownlee doing

23   with the cell phone?

24       A.   He was calling somebody. I don't know

OFFICER SALVATORE DAVI

139

1    who.

2        Q.    And how did you become aware that he
3    was calling somebody?

4        A.    Because I heard him talking, and I
5    thought he was talking to himself, and I looked
6    back and I saw him with his hands behind his
7    back, and he had his cell phone out.

8        Q.    Did you know he had a cell phone
9    before you put him in the back of the squad
10   car?

11       A.    I don't remember if I knew or not.

12       Q.    Where was the cell phone?

13       A.    I don't know.

14       Q.    Is there any reason why you would have
15   let Mr. Brownlee have a cell phone?

16       A.    No.

17       Q.    He was becoming agitated before you
18   put him into the squad car, correct?

19       A.    Yes.

20       Q.    He had given you a false name,
21   correct?

22       A.    Yes.

23       Q.    When you told him that he had given
24   you a false name he told you:

1    "What are you going to do about

2    it?", correct?

3        A.   Yes.

4        Q.   Any reason why you would have let

5    Mr. Brownlee have a cell phone in the back of

6    that squad car?

7        A.   I don't know.

8        Q.   Well, do you know of any reason you

9    would have let Mr. Brownlee have a cell phone

10   in the back of the squad car?

11       A.   No.

12       Q.   Do you know if Mr. Brownlee had hidden

13   that cell phone somewhere on his body where you

14   could not find it?

15       A.   I don't know.

16       Q.   Did Mr. Brownlee have a holster for

17   the cell phone clipped to his pants?

18       A.   I don't know, there may have been one

19   inventoried in his property.

20       Q.   Well, did you later determine that

21   Mr. Brownlee had a cell phone holster clipped

22   to the side of his pants?

23       A.   I can't recall.  I would have to look

24   at my report.

OFFICER SALVATORE DAVI

141

1    Q.   Why did you -- Strike that.

2                Was Mr. Brownlee talking to

3    anyone on the cell phone?

4    A.   He wasn't talking to me. He must have

5    been talking to somebody.

6    Q.   What was he saying?

7    A.   I don't know.

8    Q.   Were you listening to what he was

9    saying?

10   A.   No.

11   Q.   Why weren't you listening to what he

12   was saying?

13   A.   Because he was agitated and yelling

14   and doing all sorts of things, so I just wanted

15   to get him to the station.

16   Q.   And why did you want to get him to the

17   station?

18   A.   I wanted to get him out of the back

19   seat of my car and start getting him processed.

20   Q.   Did you think the safest place for you

21   and Mr. Brownlee was the police, the

22   Bolingbrook Police Department?

23        MR. PENROSE: Do you understand the

24   question?

12:52PM (lines 10)

12:52PM (line 20)

OFFICER SALVATORE DAVI

1       THE WITNESS:  No.  Can you rephrase

2   that?

3   BY MR. AINSWORTH:

4       Q.   Yes, sir.

5            While you were transporting  Mr.

6   Brownlee, was it your understanding that the

7   safest place for you to be was at the

8   Bolingbrook Police Department?

9       A.   Yes.

10      Q.   You mentioned you made a stop though,

11   is that correct?

12      A.   Yes.

13      Q.   Why did you stop the car?

14      A.   To get Mr. Brownlee's cell phone away

15   from him, because I didn't know who he was

16   calling.

17      Q.   Was he saying something into the cell

18   phone that was threatening you to?

19      A.   I don't know.  I wasn't listening.

20      Q.   Were you trying to find out --

21            Well, why did you want to get the

22   cell phone away from him?

23      A.   Because I don't know who he was

24   calling.

12:53PM (line 10)

12:53PM (line 20)

OFFICER SALVATORE DAVI

143

1    Q.   What were your concerns?

2    A.   Officer safety.

3    Q.   How would Mr. Brownlee making a phone

4    call impact your safety?

5    A.   Because he could be calling somebody

6    to tell them where we were to come and do

7    something to me to get him out of the back of

8    that squad car.

9    Q.   Was Mr. Brownlee saying something to

10   somebody else about where you were?

11   A.   I don't know.

12   Q.   Were you listening to find out whether

13   Mr. Brownlee was telling somebody where you

14   were?

15   A.   No.

16   Q.   Were you listening to find out whether

17   Mr. Brownlee was calling other friends to tell

18   them to come to a particular location so that

19   they could do harm to you?

20   A.   No.

21   Q.   So you were concerned about who he was

22   calling, correct?

23   A.   Yes.

24   Q.   And you were concerned about what he

1    was saying to whomever he was calling, correct?

2        A.  Yes.

3        Q.  But you were not listening to what he

4    was saying to whomever he was calling, is that

5    correct?

6        A.  Yes.

7        Q.  Up until the time that you got to the

8    place where you stopped, did you have any

9    conversation with Mr. Brownlee in the -- inside

10   of the squad car?

11       A.  No.

12       Q.  Did you give him any commands?

13       A.  I'm sorry?

14       Q.  Did you give him any commands?

15       A.  Any commands?

16       Q.  Yes.

17       A.  No. Command what?

18       Q.  Any commands?

19       A.  No.

20       Q.  Did you tell him to stop kicking?

21       A.  No.

22       Q.  Why didn't you tell him to stop

23   kicking?

24       A.  I just didn't.

OFFICER SALVATORE DAVI

145

1    Q.   Did you tell him to stop spitting?

2    A.   No.

3    Q.   Did you tell him to get off the cell

4 phone?

5    A.   I don't know.

6    Q.   You don't know one way or another

7 whether you told him to get off the cell phone?

8    A.   No, I don't know.

9    Q.   Did you tell him to hangup the cell

10 phone?

12:55PM

11    A.   I don't know.

12    Q.   Do you recall telling him to hangup

13 the cell phone and then Mr. Brownlee didn't

14 hangup the cell phone but went ahead with his

15 call anyway?

16    A.   No, I don't remember saying as far as

17 hangup your cell phone.

18    Q.   On any other occasion have you ever

19 stopped a squad car with an arrestee in the

12:56PM

20 back and then gone into the back seat?

21    A.   Yes.

22    Q.   How many other occasions has that

23 happened?

24    A.   I don't know.

OFFICER SALVATORE DAVI

146

1      Q.    Can you recall any particular time

2   that that's happened?

3      A.    No.

4      Q.    Where did stop your vehicle?

5      A.    I stopped it on the south side of

6   Boughton Road at Boughton and -- I'm drawing --

7   Goodwin, I'm extremely tired.  I'm sorry.

8   What -- I'm drawing a blank. I know -- I know

9   the name of the street, Boughton and Goodwin.

10  Just west of Ashbury, Boughton and Goodwin. I

11  think that's the name of the street.

12     Q.    Sir, are you on any medication today?

13     A.    No, I'm -- I was up late last night, I

14  apologize.

15     Q.    Are you on any medication today that's

16  going to effect your ability to recall the

17  event?

18     A.    No.

19     Q.    And if you need a break at any time

20  I'm certainly happy to extend that courtesy to

21  you.

22     A.    Thank you.  I appreciate it.

23     Q.    Do you need a break at this time?

24     A.    No, I don't.

OFFICER SALVATORE DAVI

147

1      Q.   Did you stop the car in a parking lot?

2      A.   No.

3      Q.   Did you stop the car on the street?

4      A.   On East Street, yes, on Goodwin at

5  Boughton.

6      Q.   Which direction was your car facing on

7  Goodwin?

8      A.   Southbound.

9      Q.   Why did you pick that particular

10  location to pull over?

11      A.   Because it was the next street

12  available.

13      Q.   What do you mean it was the next

14  street available?

15      A.   It was the next street available to

16  pull off on.

17      Q.   It was the next street available to

18  pull off on after what happened?

19      A.   After I noticed he was on the cell

20  phone.

21      Q.   How did you notice he was on a cell

22  phone?

23          MR. PENROSE: Objection, that was asked

24  before.

OFFICER SALVATORE DAVI

1      **THE WITNESS:**  I heard him talking and

2  then I turned around and saw him talking into

3  his cell phone.

4  BY MR. AINSWORTH:

5      Q.   How far after you left did he begin

6  screaming?

7      A.   It seemed like really fast, because

8  between Rye, Ashbury isn't that far. And I

9  don't know. It is a short distance, so I can't

10  tell you in exact measurements, but a short

11  time later.

12      Q.   When he began screaming did you think

13  he was on his cell phone?

14      A.   I don't know. I didn't -- it happens

15  all of the time. So I don't know.

16      Q.   What happens all of the time?

17      A.   People screaming and yelling in the

18  back of squad cars.

19      Q.   Did Mr. Brownlee's screaming change in

20  some way after it started that lead you to

21  believe that he was on a cell phone?

22      A.   Yes, because he was talking. He was

23  just talking. I knew -- I thought he was

24  probably talking to himself, because he wasn't

12:59PM (line 10)
12:59PM (line 20)

OFFICER SALVATORE DAVI

1    talking to me.

2        Q.   So at some point before you stopped

3    the car he stopped screaming, correct?

4        A.   Correct. Yes.

5        Q.   So when you stopped the car he wasn't

6    screaming?

7        A.   Yes.

8        Q.   Was the cell phone on speaker phone?

9        A.   I don't know.

01:00PM
10        Q.   What did you do when you stopped the

11    car on Goodwin?

12        A.   I advised Bolingbrook over the air

13    that he was screaming, kicking and spitting,

14    and I had to stop at Goodwin and Boughton.

15        Q.   Did you tell anything else to

16    Bolingbrook?

17        A.   I can't remember if I did or not.

18        Q.   Did you ask for anyone else to

19    respond?

01:01PM
20        A.   No.

21        Q.   Why didn't you ask for someone else to

22    respond?

23        A.   Because my goal was just to get his

24    phone so he could stop calling to whoever he