IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | | |
|---|---|---|
| TIMOTHY BROWNLEE, | ) | |
| | ) | |
| Plaintiff, | ) | 07 C 7085 |
| | ) | |
| v. | ) | Judge Ruben Castillo |
| | ) | |
| VILLAGE OF BOLINGBROOK, *et al.* | ) | |
| | ) | |
| Defendants. | ) | JURY TRIAL DEMANDED |

**PLAINTIFF'S RESPONSE TO DEFENDANTS'**
**MOTION FOR SUMMARY JUDGMENT**

Plaintiff, TIMOTHY BROWNLEE, by his attorneys, LOEVY & LOEVY, submits the following Response Brief to the Defendants' Motion for Summary Judgment:

**Introduction**

Reaching to find probable cause of any kind, Defendants suggest that Plaintiff might have been guilty of disorderly conduct. The record refutes that argument. According to the Pausches' written statement and Davi's deposition testimony, the only complained-of conduct was Plaintiff supposedly cursing at the Pausches, alarming them. But Illinois law has been clear since at least 1975 that curse words alone cannot constitute disorderly conduct. *See also People v. Douglas*, 29 Ill.App.3d 738, 742-43, 331 N.E.2d 359, 363 (Ill. 1975) ("Vulgar language, however, distasteful or offensive to one's sensibilities, does not evolve into a crime because people standing nearby stop, look, and listen. The State's concern becomes dominant only when a breach of the peace is provoked by the language.").

Equally unpersuasive is Defendants' contention that summary judgment is warranted on both of Plaintiff's excessive force claims. Boxed into a corner by a clear factual dispute, Defendant are forced to argue that yanking Plaintiff out of a squad car backwards by his handcuffs, punching him in the stomach, raising his handcuffed wrists painfully above his head to cause him pain, and squeezing his testicles (in the absence of any justification) are all "*de minimus*" uses of force. Next, Defendants claim that the Fourth Amendment permits a police

officer to "pop[] and crack[]" the thumb joint of a passive resistor. None of these arguments have any merit, as Plaintiff explains below.

I. **Defendants Did Not Have Probable Cause to Arrest Plaintiff For Obstruction of Justice, Disorderly Conduct, or Any Other Crime**

    A. **Plaintiff's Statement of Facts Regarding His False Arrest**

On May 28, 2007, Plaintiff was planning to host a Memorial Day barbecue for his immediate and extended family at his home in Bolingbrook, Illinois. Plaintiff's Local Rule 56.1 Statement of Additional Facts ¶1 (hereafter, "Pl. L.R. Stmt"). At the time, Plaintiff had been having problems with his next-door neighbor (Mr. Pausche) picking on Plaintiff's children and complaining about his dog allegedly defecating on Mr. Pausche's lawn. Pl. L.R. Stmt. ¶2. As Plaintiff left his home to go to the store, he told his children and his nieces that he was going to the store, and not to let Mr. Pausche do anything to them or say any thing to them, or they should let Plaintiff know. Def. L.R. Stmt. ¶4. Mr. Pausche said "I heard what you said," and Plaintiff responded that he wanted his neighbor to hear him. Def. L.R. Stmt. ¶5; Pl. L.R. Stmt ¶3. Plaintiff then drove to the store with his fiancé, Tiggen Sandifer. Pl. L.R. Stmt ¶3.

Soon thereafter, Defendant Davi received a dispatch to respond to a "neighbor dispute" at Plaintiff's neighbor's house. *Id.* ¶4. Davi responded to the scene and spoke with Plaintiff's next-door neighbors, the Pausches, who told the officer that they were having an "ongoing dispute" with Plaintiff "regarding a bunch of issues, children on their grass, their dog defecating on their grass, issues like that. Mostly to do with the children." *Id.* ¶5. The Pausches told Davi that they had a verbal altercation with Mr. Brownlee in which Plaintiff "was telling his children not to listen to [Mr. Pausche] and for his kids to tell him if [Mr. Pausche] tells them anything." *Id.* ¶6. Mr. Pausche then said "I heard what you said." *Id.* There is a dispute of fact about what happened next. According to Mr. Pausche, Mr. Brownlee had responded "I meant for your mother fucking white ass to hear that." *Id.* At the time, Mr. Brownlee was never on the Pausches' property. *Id.* ¶7. In fact, at the time of the exchange, Plaintiff was backing out of his driveway, and the Pausches were on their front porch. *Id.*; Pl. Resp. Def. L.R. Stmt. ¶6.

There is no dispute that, based on his conversation with the Pausches, Davi admits that he did not have probable cause to arrest Plaintiff:

2

> Q: So based on what they told you at the first scene you didn't believe you had probable cause to arrest Mr. Brownlee?
>
> A: Right. There is no probable cause there to arrest at that time without getting the other half of the story.

Pl. L.R. Stmt. ¶8; *see also id.* ("Q: So up until the time that you found out that Mr. Brownlee's name was Brownlee, you didn't have any probable cause to arrest either Mr. Brownlee or anybody else at the scene? A: Correct.").

Davi then saw Plaintiff arrive in his car, which Plaintiff was driving. *Id.* ¶9. Davi spoke to Plaintiff, who confirmed that when he was leaving his house, he told his children not to confront his neighbor, but rather to tell him or another adult. *Id.* ¶10. Davi then asked for Plaintiff and his fiancé's identification. *Id.* ¶11. Plaintiff and his fiancé, Tiggen Sandifer, provided their identification to Davi. *Id.* Davi took the identification from them, walked away, and then returned their IDs to them, telling them "Hey, everybody try to get along." *Id.* ¶12. Davi told both Plaintiff and the Pausches to stay away from each other and planned to leave. Def. L.R. Stmt.¶21.

Plaintiff went inside his home and started watching television. Pl. L.R. Stmt. ¶12. About fifteen to thirty minutes later, Davi came to the front door and accused Plaintiff of giving him a false name. *Id.* ¶13. Plaintiff denied that he had done any such thing, and explained that he had provided his identification, as requested. *Id.*

It suffices for present purposes that Plaintiff denies giving a false name but it bears mention that Defendants' contention makes no sense. Plaintiff had no reason to hide his identity from the police: he had no warrants out for his arrest, he was at his own home, and the only trouble with the law he had ever had was court supervision for a misdemeanor battery when he was seventeen years-old. *Id.* ¶14.[1]

---

[1] Though Plaintiff has no obligation to explain why Defendants are falsely claiming he gave them the wrong name, it is possible that Officer Davi simply made a mistake. Plaintiff and his fiancé share the same birth dates – one year apart – and Davi (who thought Plaintiff had given him the name Timothy Sandifer) could easily have confused Plaintiff's first name with Ms. Sandifer's last name. Pl. L.R. Stmt. ¶15.

In any event, Davi arrested Plaintiff and placed him in the back of his police car. Def. L.R. Stmt. Facts ¶¶37-38.

### B.　　Plaintiff's False Arrest Claims Must Be Presented to a Jury

As an initial matter, Defendants concede that it is disputed whether Plaintiff gave a false name to Davi, and, therefore, Plaintiff only responds to Defendants' argument that Davi had probable cause to arrest him for disorderly conduct. *See* Def. Mem. at 10.

An arrest is properly based upon probable cause "if the information available to the officer at the time of the arrest indicates that the arrestee has committed a crime." *BeVier v. Hucal*, 806 F.2d 123, 126 (7th Cir. 1986). "The question of probable cause is typically 'a proper issue for a jury if there is room for a difference of opinion concerning the facts or the reasonable inferences to be drawn from them.'" *Sornberger v. City of Knoxville*, 434 F.3d 1006, 1013-14 (7th Cir. 2006) *quoting Maxwell v. City of Indianapolis*, 998 F.2d 431, 434 (7th Cir. 1993).

Here, Defendants contend that probable cause existed to arrest Plaintiff for disorderly conduct. That argument fails because Plaintiff's conduct, as reported by Mr. Pausche, was not criminal under Illinois law, and, to the extent there is any dispute as to whether Plaintiff's conduct was criminal, that is for a jury to decide.

Viewing the evidence available to Defendant Davi when he arrested Plaintiff at his home, he was dispatched to resolve a "neighbor dispute." Defendant Davi knew that Mr. Pausche was unhappy with Plaintiff in the past because his dog had pooped on his lawn. Defendant Davi was further told that, as Mr. Brownlee was backing out of his driveway, Mr. Brownlee told his children not to listen to Mr. Pausche (who was sitting on his porch) and told Mr. Pausche that he wanted his mother fucking ass to hear him.

Under the case law, this conduct does not rise to the level of criminal activity. *See People v. Redwood*, 335 Ill. App. 3d 189, 193, 780 N.E.2d 760, 764 (Dist. 2002) ("we conclude that the speaker's 'fighting words' must contain either an explicit or implied threat and that vulgarities and epithets do not suffice to trigger the State's prosecutorial powers and criminal sanctions" under the disorderly conduct statute); *see also People v. Allen*, 288 Ill. App. 3d 502, 506, 680 N.E.2d 795, 799, 223 Ill.Dec. 845, 849 (4 Dist. 1997) ("Language that is vulgar or offensive does not necessarily breach the peace.").

As Defendant Smetters acknowledged, it is the context that determines whether complained of conduct is actually disorderly:

    Q:    Is it a crime to say mother fucking white ass to somebody?
    A:    It depends on how you do it.

***

    Q:    Just saying that in itself, saying mother fucking white ass to somebody while they were 30 to 40 feet away?
    A:    I don't know.

Pl. L.R. Stmt. ¶16. *See also People v. Douglas*, 29 Ill.App.3d 738, 742-43, 331 N.E.2d 359, 363 (Ill. 1975) ("Vulgar language, however, distasteful or offensive to one's sensibilities, does not evolve into a crime because people standing nearby stop, look, and listen. The State's concern becomes dominant only when a breach of the peace is provoked by the language.").

Perhaps recognizing the futility of their curse word argument, Defendants claim that Davi was given more information that, despite the fact that even he did not believe there was probable cause to arrest Plaintiff, establishes as a matter of law that there existed probable cause to arrest Plaintiff for disorderly conduct.

Defendants first rely on Mr. Pausche's 911 call as evidence of what Davi knew. Def. Memo. at p. 9. This reliance is misplaced because Mr. Pausche spoke to a dispatcher, not Davi, during that call, who relayed to Davi that there was a "neighbor dispute" at the Pausches' residence. Pl. L.R. Stmt. ¶4. Thus, all Davi knew before he arrived at the scene was that there was a dispute between neighbors.

Defendants also suggest that Mr. Pausche told Davi that "Plaintiff had threatened him and menaced him." Def. Memo at p. 9. The cited material, however, does not support Defendants' contention that Mr. Pausche told Davi anything about being threatened or menaced. *See* Def. L.R. Stmts. ¶¶11, 16.

Furthermore, Mr. Pausche never mentioned any such thing to Davi. According to Defendant Davi, he testified that the Pausches told him the reason they called 911 was because Plaintiff cursed at them: "And [Plaintiff] cursed in the process [of telling the Pausches not to talk to Plaintiff's children] which made them alarmed and disturbed to call the police." Pl. L.R. Stmt. ¶17. Again, cursing at someone (even if it alarms that person) is not enough to warrant a disorderly conduct charge. *See People v. Bradshaw*, 452 N.E.2d 141, 142 (Ill. 4 Dist. 1983)

(calling person obscene names for fifteen minutes not disorderly conduct as a matter of law).

Moreover, the Pausches' written statement to the police mentions nothing about being menaced or threatened by Mr. Brownlee. Pl. L.R. Stmt. ¶18. Their entire statement follows:

> Around 1 p.m., May 28, 2007, I was talking to my husband on the front porch. The neighbor at 3 Rye Court came out with his wife (I think) [sic]. He was telling his children not to listen to my husband and for his kids to tell him if my husband tells them anything not to listen to him and he said it loud enough for us to hear. My husband said I hear you and [Mr. Brownlee] said "I want you to hear me" "I want your mother fucking white ass to hear me" at that point we came in the house and we called 911. He was still yelling and then drove off. He also raised his hand towards us as he wanted to emphasize what he was saying. We are willing to sign complaints.

*Id.* Nowhere in the Pausches' statement is there anything about Plaintiff threatening them. For his part, Plaintiff denied that he had done anything wrong - neither swearing at the Pausches nor taking any action to threaten or interfere with them. *Id.* ¶19.[2]

In addition, at Mr. Pausche's deposition (which was the first time he mentioned anything about Plaintiff being menacing), Mr. Pausche explained that what he meant by "menacing" was Plaintiff nothing more sinister than walking "fast and deliberate[ly]." *Id.* ¶20. As mentioned above, it is undisputed that Plaintiff was at the end of his driveway when he interacted with the Pausches, the Pausches were on their porch, and Plaintiff never entered or even touched their property line. *Id.* ¶7.

Here, there is ample evidence to suggest that a jury could find that there was no probable cause to believe that Plaintiff was acting illegally. If Defendant Davi truly had information about Plaintiff threatening people and breaching the peace, he would have said so at his deposition. If Plaintiff had really threatened Mr. Pausche, he would have included that in his written statement.

---

[2] Because there is a factual dispute about whether Davi was told that a crime had been committed, Defendants' reliance on *Askew* is misplaced. In *Askew v. City of Chicago*, the defendant police officer was given information about a man with a knife threatening people - a clear violation of the law. 440 F.3d 894 (7th Cir. 2006). *Askew* stands for nothing more than the age-old principle that probable cause may be based on information provided by third-party complainants, and does not evaporate even if the person turns out to be innocent of the charged crime. *Askew* does not alter the fundamental rule that, for probable cause to exist, there must be evidence supporting the belief that a crime has actually been committed.

Even if Mr. Pausche did tell Davi that Plaintiff was walking "fast and deliberate[ly]," whether that conduct and the alleged cursing (from a distance at least as far as the space between the street and the Pausches' front porch) amounts to disorderly conduct is a question for the jury. Plaintiff agrees with Defendants that "'disorderly conduct has never had a precise definition; the types of conduct that may be disorderly conduct almost defy definition.'" Def. Mem. at 10, quoting *Lester v. City of Chicago*, 830 F.2d 706, 714 (7th Cir. 1987). To determine whether Plaintiff acted contrary to the disorderly conduct statute necessarily requires a determination as to whether he acted "unreasonably." *See* 720 ILCS 5/26-1(1) (prohibiting "any act in such unreasonable manner as to alarm or disturb another and to provoke a breach of the peace"). As the Seventh Circuit has noted, "what is 'reasonable' is a classic jury question." *Biomet Orthopedics, Inc. v. Tact Medical Instruments, Inc.*, 454 F.3d 653, 655 (7th Cir. 2006).

The propriety of submitting the question of probable cause to a jury is born out by Defendant Davi's admission that no probable cause existed to arrest Plaintiff based on what he was told by the Pausches. Davi's own subjective belief as a trained officer regarding the existence of probable cause based on the reasonableness of Plaintiff's actions is certainly evidence from which this Court may infer that a reasonable juror, hearing the evidence that Defendant Davi heard, will agree that no probable cause existed for Plaintiff's arrest. Davi's testimony on this point is as follows:

> Q: So up until the time that you found out that Mr. Brownlee's name was Brownlee, you didn't have any probable cause to arrest either Mr. Brownlee or anybody else at the scene?
> A: Correct.

Pl. L.R. Stmt. ¶8; *see also id.* ("Q: So based on what they told you at the first scene you didn't believe you had probable cause to arrest Mr. Brownlee? A: Right. There is no probable cause to arrest at that time without getting the other half of the story."). Davi proceeded to tell both neighbors to try to get along and Plaintiff went inside his house. *Id.* ¶12.[3]

---

[3] Defendants may (and will) contend that Davi's subjective belief is irrelevant because the test is an objective one. Plaintiff concedes that point - otherwise, this Court would have to grant summary judgment in Plaintiff's favor. Rather, Davi's belief is evidence that the Pausches' description of the events, coupled with his observations and the totality of the circumstances, did not rise to the level of probable cause. The fact that disorderly conduct contains a reasonableness

7

Furthermore, if the Pausches had really told Davi that Plaintiff had committed a crime, we would expect that Mrs. Pausche would not be "shocked" that Davi would arrest Plaintiff as a result of her complaint. Her testimony is the exact opposite:

> Q: Was Brownlee arrested before or after you signed the document which is before you as Exhibit 1?
> A: That time frame I don't remember. That time frame I don't remember *because I was shocked to see him being arrested*.
> Q: Why were you shocked to see him being arrested?
> A: Because, I mean, there was no physical fight or anything like that. I mean, I was just surprised that the police came and took him out in handcuffs.

Pl. L.R. Stmt ¶21 (emphasis added).

"Questions of reasonableness are necessarily questions of relation and degree." *Sugar Institute v. United States*, 297 U.S. 553, 600 (1936); *see also Go-Bart Importing Co. v. United States*, 282 U.S. 344, 357, 51 S.Ct. 153, 158 (1931) ("There is no formula for the determination of reasonableness."). Resolving the reasonableness question here will necessarily involve two issues for a jury to resolve: whether the Pausches told Davi that they were threatened and, if so, whether Plaintiff's conduct gave Defendant Davi probable cause to believe that Plaintiff was acting unreasonably and causing a breach of the peace in violation of 720 ILCS 5/26-1. This Court cannot resolve these questions without making findings of fact which are forbidden given the procedural nature of these proceedings.[4]

---

prong is what makes Davi's impressions relevant. If the alleged crime was one of strict liability, Davi's subjective knowledge would be totally irrelevant to this Court's inquiry at summary judgment. *See, e.g., Haywood v. City of Chicago*, 378 F.3d 714, 717 (7th Cir. 2004) (officer's subjective knowledge of strict liability gun possession law irrelevant to probable cause inquiry). But because the complained-of conduct had to be unreasonable in order to be criminal, Davi's impressions are relevant here.

[4] Defendants do not contend that the existence of probable cause for disorderly conduct knocks out Plaintiff's malicious prosecution claim. That waiver is appropriate because Plaintiff was charged only with the attempted obstruction of justice charge. *See Holmes v. Village of Hoffman Estate*, 511 F.3d 673, 682 (7th Cir. 2007) ("probable cause to believe an individual committed one crime-and even his conviction of that crime-does not foreclose a malicious prosecution claim for additionally prosecuting the individual on a separate charge").

### C. Plaintiff's *Gerstein* Hearing Does Not Collaterally Estop Him From Challenging His False Arrest

Defendants contend that Plaintiff is collaterally estopped from challenging the existence of probable cause because he was present for his *Gerstein* hearing, at which the prosecutor relayed Officer Davi's account of the alleged false name giving to the judge, who made a perfunctory probable cause finding. Neither Plaintiff, nor any of his witnesses, were permitted to testify in court, nor was Plaintiff permitted the opportunity to cross-examine Defendant Davi on the issue. No court in this Circuit has ever found that such a truncated proceeding prevents litigation of the existence of probable cause in a §1983 action. The law is actually the opposite.

Collateral estoppel is an equitable doctrine. *Talarico v. Dunlap*, 685 N.E.2d 325, 328 (Ill. 1997). To be bound by a prior ruling, Defendants bear the burden of proving that "a decision on the issue must have been necessary for the judgment in the first litigation, and the person to be bound must have actually litigated the issue in the first suit." *Id.* Here, Plaintiff had no opportunity to litigate the issue at his *Gerstein* hearing - the only person who testified was the Assistant State's Attorney, who was not present for any of the events. There is no suggestion that Plaintiff testified or had the opportunity to call witnesses.

Defendant's citation to *Guenther v. Homgreen*, 738 F.2d 879 (7th Cir. 1984) is inapposite. In that case, arising out of Wisconsin, the plaintiff had actively litigated the question whether probable cause existed by moving to dismiss the charges and, at the subsequent evidentiary hearing, cross-examining the defendant police officer, other state witnesses, and calling a witness in his own defense. *Id.* at 881, 887. Here, in contrast, the record establishes that the only person who presented evidence regarding probable cause was the State's Attorney. *See* Def. L.R. Stmt. ¶79. Defendants have presented no evidence that Plaintiff had the opportunity to challenge the issue of probable cause at all at his *Gerstein* hearing. *See* Pl. L.R. Stmt. ¶22 (Davi never testified in court); *Gerstein v. Pugh*, 420 U.S. 103, 120, 95 S.Ct. 854, 866 (1975) (disavowing any requirement for adversarial proceedings to determine probable cause at initial hearing). Rather, the issue at the *Gerstein* hearing is whether the evidence, as presented by the State, is sufficient to establish probable cause. *Id.* That is a very different question than the one presented here - whether there actually was probable cause to arrest Plaintiff in the first place.

*See Whitley v. Seibel*, 676 F.2d 245, 249 (7th Cir. 1982) (refusing to apply collateral estoppel to state court probable cause finding because §1983 plaintiff was challenging "the integrity, rather than the sufficiency, of the evidence" and the prior probable cause hearing was geared toward the sufficiency of the evidence).

Equally fatal to Defendants' estoppel argument is the fact that Plaintiff was never permitted the opportunity to appeal the probable cause finding. In Illinois, collateral estoppel is unavailable when "the party against whom preclusion is sought was unable to appeal the judgment in the initial action." *Sornberger v. City of Knoxville, Ill.*, 434 F.3d 1006, 1020 (7th Cir. 2006). In *Sornberger*, the Seventh Circuit declined to give preclusive effect to a suppression finding by the state criminal court because that decision was unappealable when, like here, the charges were later dropped against the plaintiff. *Id.* at 1020 ("the unavailability of an appeal is determinative"); *see also Guenther*, 738 F.2d at 886 (distinguishing *Whitley* because Whitely did not litigate the issue of probable cause and did not have the ability to appeal that decision).

The equitable doctrine of collateral estoppel is to be employed only in circumstances in which "it is clear that no unfairness results to the party being estopped." *Talarico*, 685 N.E.2d at 329. It would be totally unfair to estop Plaintiff from challenging probable cause here simply because Defendant Davi's false claims were used to obtain the probable cause finding Defendants seek to use against Plaintiff. Because he did not have a full and fair opportunity to litigate his claims, Plaintiff should not be estopped here on the basis of receiving a *Gerstein* hearing. *See Evans v. Katalinic*, 445 F.3d 953, 955-56 (7th Cir. 2006) (calling defendant police officers' attempt to invoke collateral estoppel "absurd" even though suppression hearing decided same issue).

### III.    Excessive Force

Plaintiff has described a brutal physical assault on his person that undisputedly caused him extreme physical pain and suffering. Plaintiff complains of two incidents of excessive force. The first, which occurred off camera, involved Defendants Davi and Smetters pulling Plaintiff out of the back seat of a squad car by his handcuffs, maliciously causing him pain him by pulling his handcuffed wrists backwards over his head, punching him in the stomach, and painfully squeezing his testicles. The second was the violent damage to Plaintiff's thumb, also off-camera,

in the booking room at the station. Each of these events constitutes excessive force in violation of the Fourth Amendments.

> A. **The Fourth Amendment Governs Excessive Force Used By Police Officers Against Arrestees Prior to Any Probable Cause Hearing**

The Fourth Amendment applies to the use of force against Plaintiff. Defendants' argument to the contrary borders on frivolousness. In essence, Defendants contend that because the Eighth Amendment applies to pretrial detainees, the Eighth Amendment applies to Plaintiff here. Defendants skip the necessary step of explaining why Plaintiff was a pretrial detainee at the point he alleges he was beaten.

In the context of use of force, a pretrial detainee is someone who has not yet been charged. *See Bell v. Wolfish*, 441 U.S. 520, 523 (1979) ("This case requires us to examine the constitutional rights of pretrial detainees – those persons who have been charged with a crime but who have not yet been tried on the charge."). Plaintiff, who had not yet appeared for his probable cause hearing when he was subjected to force, was entitled to the Fourth Amendment's prohibition on unreasonable seizures.

Any room for disagreement on this issue was put to rest by the Seventh Circuit in *Lopez v. Chicago*, 464 F.3d 711 (7th Cir. 2006):

> Because Lopez was arrested without a warrant and had not yet been presented for a probable cause hearing, the Fourth Amendment should have been applied to his claim relating to the treatment and conditions he endured during his four days and nights in warrantless detention. Although his claim does not challenge the existence of probable cause, our cases hold that **the *Gerstein* probable cause hearing is the event that terminates the Fourth Amendment's applicability following a warrantless arrest.**

*Id.* at 719 (emphasis added).

Defendants unpersuasively try to distinguish *Lopez*. Memo at 6. Their first argument, that Lopez was not an excessive force case, is a distinction without a difference. That Lopez alleged that he was starved for four days while shackled rather than beaten does not change the Seventh Circuit's holding that the manner of pre-*Gerstein* confinement should be judged by the Fourth Amendment.

Defendants' reliance on *Bell* is addressed above - *Bell* dealt with pre-trial detainees, not pre-*Gerstein* arrestees. Similarly, *Chavez* is a non-starter - in *Chavez*, the Supreme Court simply held that the *Fifth* Amendment did not apply to coercive interrogations prior to the initiation of a criminal case. *Chavez v. Martinez*, 538 U.S. 760 (2003). Next, *Wiley* actually supports Plaintiff's argument. Wiley makes plain that "the scope of a Fourth Amendment claim is limited to the point of arraignment," rather than continuing the seizure past that point. *Wiley v. City of Chicago*, 361 F3d 994, 998 (7th Cir. 2004); *see also Brokaw v. Mercer County*, 235 F.3d 1000, 1018 n.14 (7th Cir. 2000) ("this court has rejected the concept of a 'continuing seizure,' holding instead that following a *Gerstein* probable cause hearing, the Fourth Amendment no longer applies, but that substantive due process addresses the post-probable cause detention). Finally, *Burton v. Ruzicki*, 258 Fed.Appx. 882 (7th Cir. 2007), is also inapposite because, unlike here, the plaintiff in that case was a pretrial detainee.

Although Defendants purportedly argue that they did not violate either the Fourth or the Eighth Amendments, every single case they cite in support of their position arises under the Eighth and Fourteenth Amendments. *See* Memo. at 6-8, citing *Soto v. Dickey*, 744 F.2d 1260 (7th Cir. 1984) (Eighth Amendment); *Colon v. Schneider*, 899 F.2d 660 (7th Cir. 1990) (Fourteenth Amendment); *Floyd v. Nelson*, Case No. 00 C 1079, 2002 WL 1483896 (N.D. Ill. July 11, 2002) (same); *Hewitt v. Helms*, 459 U.S. 460 (1983) (same); *Walker v. Shansky*, 28 F.3d 666, 672 (7th Cir. 1994) (same); *Whitley v. Albers*, 475 U.S. 312 (1986) (same). These cases are all inapplicable to the Fourth Amendment analysis required here.

**B.     The Video Provides No Basis on Which to Grant Summary Judgment**

The videotape provides no basis on which to grant summary judgment on Plaintiff's excessive force claims. To begin, the first incident was not caught on videotape. Although Defendant Smetters' car was parked directly behind Defendant Davi's, and despite the fact that Defendant Smetters' car was equipped with a video camera facing forward, that video camera was either deliberately turned off so it would not record the events during the stop on the way to the police station or that videotape has been destroyed. Pl. L.R. Stmt. ¶38.

In regard to the damage to Plaintiff's thumb at the police station, the actual twisting of his thumb is not captured on tape - Plaintiff's hands are hidden by his body at that point of the video.

Furthermore, the events leading up to that event are either already undisputed or equivocal. For example, it is undisputed by the parties that Plaintiff refused to leave his cell without his shoes, and that the Defendants then dragged him from the cell. As for the handcuffing, the video shows Defendants Hilliard and Smetters pulling on Plaintiff's arms - Defendants say because Plaintiff was resisting, and Plaintiff contends that he did nothing to resist yet Defendants were pulling and twisting his body around. *Compare* Pl. L.R. Stmt. ¶¶32-33 with Def. L.R. Stmt. ¶¶67-68. It is impossible to tell which parties' version is correct based on the video alone.

Accordingly, to the extent Defendants' Motion is predicated on their claim that the video demonstrates undisputed facts, their Motion must be denied. *Abdullah v. City of Madison*, 423 F.3d 763, 773 (7th Cir. 2005) ("since the *Graham* reasonableness inquiry 'nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom . . . summary judgment or judgment as a matter of law in excessive force cases should be granted sparingly'"), *quoting Santos v. Gates*, 287 F.3d 846, 853 (9th Cir. 2002).

    **C.**    **Plaintiff's Abuse Prior to Arriving at the Station is Not *De Minimus***

After arresting Plaintiff and placing him in his squad car, Davi began berating Plaintiff for being a thirty-five year-old man picking on an eighty year-old (referring to Mr. Pausche). Pl. L.R. Stmt. ¶23. Davi continued his verbal assault by stating that "niggers weren't supposed to be in Bolingbrook," and that when "he get[s] [Plaintiff] back to the station, he's going to kick [Plaintiff's] ass." *Id.* ¶24.

At that point, Plaintiff wanted to call someone and let them know he was being taken to the police station to be beaten. *Id.* Plaintiff, whose cell phone was still attached to his pants, reached over and called his brother, a Chicago police officer. *Id.* ¶25. Defendant Davi, upon hearing Plaintiff making a call on his cellular telephone, said "this dude is recording me" and pulled over. *Id.* ¶26. Davi then opened the back door to the squad car and pulled him out of the car backwards. *Id*. While Plaintiff was still handcuffed, Davi punched him in the stomach, grabbed his testicles, and asked Plaintiff who he called on his cell phone. *Id.* ¶27. Plaintiff told Davi that he was hurting him. *Id.* Smetters then grabbed Plaintiff's cell phone while Davi pulled Plaintiff's handcuffed wrists behind his head in an uncomfortable position while asking him for the code to his cell phone. *Id.* ¶28.

Defendants have no explanation that would justify any of this misconduct. Instead, Davi simply denied that these activities occurred. Def. L.R. Stmt. ¶49. For his part, Smetters has a convenient case of amnesia about what happened during the stop on the way to the station. Smetters claims that although he remembers Davi stopping his squad car on the way to the station, he has absolutely no memory of the details of the event, and cannot recall one way or the other whether Davi, himself, or Plaintiff ever exited their squad car while stopped. Pl. L.R. Stmt. ¶29 ("I remember myself and my marked squad pulling behind [Davi's]. After that, I really don't remember [what I saw]").

This evidence is more than sufficient to support Plaintiff's claim that Defendants used excessive force against him. Plaintiff is claiming that he was physically tormented by Defendants in the absence of any justification for using physical force against him.

Defendants concede (as they must) that the record establishes that the force occurred, but respond that only a *de minimis* amount of force was used against Plaintiff. Defendants' argument is easily dismissed. First, Defendants misconstrue the appropriate standard, as they again cite Eighth and Fourteenth Amendment cases. *See* Def. Memo at 8, citing *Fillmore v. Page*, 358 F.3d 496, 503 (7th Cir. 2004) (Eighth Amendment); *DeWalt v. Carter*, 224 F.3d 607, 619 (7th Cir. 1999) (same); *Riley v. Dorton*, 115 F.3d 1159, 1166 (4th Cir. 1997) (Fourteenth Amendment). Second, all of the cases cited by Defendants involve misconduct by the plaintiff justifying some use of force. *See Fillmore*, 358 F.3d at 500 (prisoners threw scalding oil on officers); *DeWalt*, 224 F.3d at 610-611 (prior to being shoved into doorway, prisoner expressed his dissent); *Riley*, 115 F.3d at 1161 (plaintiff pretrial detainee insulted officer). In this case, Mr. Brownlee denies that he did anything to justify even the slightest use of force en route to the police station, making these cases inapposite here.

Accordingly, Plaintiff's testimony that Defendants yanked him backwards out of the squad car by his handcuffs, punched him in the stomach, pulled his handcuffed wrists backwards over his head, and squeezed his testicles establishes an unreasonable use of force. *See Clash v. Beauty*, 77 F.3d 1045, 1048 (7th Cir. 1996) (stating that "officers do not have the right to shove, push or otherwise assault innocent citizens" without provocation); *see also Payne v. Pauley*, 337 F.3d 767, 772 (7th Cir. 2003) (indicating that the plaintiff's deposition testimony regarding a beating by defendant police officer is sufficient to defeat summary judgment).

### D. Defendant Hilliard is Not Entitled to Summary Judgment for Snapping Plaintiff's Thumb

After the stop on the way to the station, Davi eventually placed Plaintiff back in the squad car and drove to the station. At the station, Defendants Smetters and Davi took his flip-flops and required Plaintiff to remove his pants, despite the fact that Plaintiff told them that he was not wearing any underclothes. Pl. L.R. Stmt. ¶30. Plaintiff was compliant during the strip search. *Id.* He was then placed in a cell inside the police department. Def. L.R. Stmt. Facts ¶58.

Some time later, Defendant Smetters ordered Plaintiff out of his cell. Def. L.R. Stmt. Facts ¶63. Plaintiff asked for his shoes back before he would exit the cell. *Id.* In response, two officers dragged Plaintiff out of the cell. Def. L.R. Stmt. Facts ¶66. Plaintiff went limp and did not otherwise resist being dragged at all. *Id.* The officers began screaming "stop resisting" to which Plaintiff screamed back, "I'm not resisting," because he was not resisting. Pl. L.R. Stmt. ¶31. The Defendants then pulled and twisted Plaintiff's arms in different direction while he was sitting on the floor, spinning him from right to left. *Id.* The Sergeant, who was grabbing Plaintiff's right hand, then grabbed his right thumb and "popped and cracked it." *Id.* ¶32.

Plaintiff, now handcuffed, reported to the Defendants that he was injured and needed a doctor. *Id.* ¶33. Defendant Davi became irate, claiming that he "had a steak waiting on him" and that Plaintiff was a "[f]ucking nigger." *Id.* At the hospital, Plaintiff, along with Defendants Smetters and Davi, were all told that Plaintiff's thumb was broken. *Id.* ¶34. The hospital staff dressed his injury and immobilized his thumb so that it stuck out away from his hand. *Id.* The injury to Plaintiff's thumb was extremely painful - it took approximately three months to heal, and he still suffers some discomfort in that thumb joint. *Id.* ¶35.[5]

Tellingly, the Defendants have no explanation for how Hilliard injured Plaintiff's right thumb. Plaintiff had no injury to his thumb before he was arrested. *Id.* ¶36. When Plaintiff was being handcuffed, Defendant Hilliard testified that he was not forced to employ any pressure point techniques on Plaintiff's thumb to gain compliance. *Id.* ¶37. Defendant Hilliard denied

---

[5] Any suggestion by Defendants that Plaintiff's injuries are mere "aches and bruising" are refuted by a glance at photographs of Plaintiff's injuries, attached to his L.R. 56.1 Statement of Additional Facts as Exhibit N.

taking any special steps to prevent injury to Plaintiff's thumb. *Id.* Hilliard does not even recall whether or not he grabbed Plaintiff's thumb. *Id.*[6]

Plaintiff, in contrast, distinctly recalls that Hilliard grabbed his thumb and "popped and cracked" the joint. The injury was significant enough that he had to have his thumb immobilized and it took between two and a half to three months to heal.[7]

Finally, Defendants contend that there was a need for force because Plaintiff refused to exit his cell without his shoes. Plaintiff, of course, is not claiming that being dragged out of his cell was excessive in response to his demand for his shoes. Rather, his refusal to exit was another triggering event that explains why the officers used the force that they used against him.

### IV. Defendants Are Likewise Not Entitled to Summary Judgment on Plaintiff's State-Law Battery and Hate Crime Claims

Plaintiff has provided evidence that all three of the Defendant Officers intentionally, willfully, and wantonly used force against him without lawful justification based on his race. *See* Pl. L.R. Stmt. ¶¶24, 27-28, 31-37. Accordingly, Plaintiff is entitled to a trial on these claims. *See* I.P.I. (Crim) §§ 11.06; 11.48.

### V. Defendants Smetters and Davi Are Not Entitled to Summary Judgment on Plaintiff's Failure to Intervene Claim

Defendants Smetters and Davi are not entitled to summary judgment on the failure to intervene claim because each had the opportunity to prevent Plaintiff's abuse during the stop on the way to the station. *See* Pl. L.R. Stmt.¶¶26-29. Plaintiff concedes that while Defendant Hilliard was using excessive force against Plaintiff, he was not in a position to stop someone else from depriving Plaintiff of his constitutional rights, and, therefore, does not object to summary judgment being entered on Plaintiff's failure to intervene claim against Defendant Hilliard.

---

[6] Moreover, even though Defendants claim that Plaintiff was resisting arrest, he was never charged with that crime. Pl. L.R. Stmt. ¶39.

[7] Even if Defendants were correct that Plaintiff was resisting being handcuffed by stiffening his arms (which he was not), nothing would justify the malicious grabbing of Plaintiff's thumb while his hands were behind his back and snapping his thumb joint. That force violates the Fourth Amendment's prohibition against unreasonable seizures.

### VI. Conspiracy

#### A. The Record Establishes Sufficient Evidence From Which A Jury May Infer That the Defendants Conspired With One Another

For a conspiracy claim under Section 1983, a Plaintiff must establish: (1) an express or implied agreement among defendants to deprive a Plaintiff of his or her constitutional right; and (2) actual deprivation of those rights in the form of overt acts in furtherance of the agreement. *Vukadinovich v. Zenz*, 995 F.3d 750, 756 (7th Cir. 1993). "Although a plaintiff must provide more than 'mere conjecture' that an agreement was reached, it is recognized that a plaintiff's ability to allege the act of agreement in detail is often unavoidably limited." *Smith v. Daniels*, 2003 WL 1717635, at *5 (N.D. Ill. March 23, 2003). "The very nature of a conspiracy obscures most, if not all, information about the alleged conspirators' agreement; circumstantial evidence of the conspiracy, particularly regarding the overt acts performed in furtherance of the conspiracy, is all that is ordinarily obtainable before discovery and trial." *Quinones v. Szorc*, 771 F.2d 289, 291 (7th Cir. 1985). For that reason, "a general allegation of an agreement to conspire, accompanied by allegations of specific acts performed in furtherance of the conspiracy, will fulfill the agreement requirement." *Smith*, 2003 WL 1717635, at *5.

Such allegations have been made here. Plaintiff's allegations of abuse span several hours and involve repeated violations of his Constitutional rights by multiple defedants.

*Smith* is directly analogous. In *Smith*, this Court held that several overt acts of the police officers were sufficient to demonstrate the existence of a conspiracy to use excessive force and fail to intervene. 2003 WL 1717635, at *5. Specifically, this Court held that the officers' discharge of their weapons, and their collective beating and handcuffing of the plaintiff while on the ground "plus the general allegation of an agreement support the inference of a conspiracy, even without specific facts to substantiate that an express agreement existed." *Id.* at 6.

#### B. The Intra-Corporate Conspiracy Doctrine Is Inapplicable Here

In an undeveloped paragraph, Defendants contend that the intra-corporate conspiracy doctrine ("ICD") bars Plaintiff's conspiracy claim. As Judge Leinenweber has explained, the ICD "was created to shield corporations and their employees from conspiracy liability for routine, collaborative business decisions that are later alleged to be discriminatory." *Moreno v.*

*Town of Cicero*, 2002 WL 31017932, at *3 (N.D. Ill. Sep. 5, 2002). Consistent with this purpose, the doctrine does not apply to conspiracies to commit excessive force because, of course, beating citizens in violation of their civil rights does not involve routine business decision-making by police officers. *See McDorman v. Smith*, 2005 WL 1869683, at *6 (N.D. Ill. Aug. 2, 2005) (Rejecting application of the doctrine to § 1983 conspiracies, finding that "the police misconduct alleged here does not fit that mold because conspiracy and cover-up are not the product of routine police department decision-making"); *Emery v. Northeast Ill. Reg'l Commuter R.R. Corp.*, 2003 WL 22176077, at *4 (N.D. Ill. Sept. 18, 2003) ("it makes sense that the doctrine will rarely, if ever, apply in police misconduct cases"); *Newsome v. James*, 2000 WL 528475, at *15 (N.D. Ill. Apr. 26, 2000) (The "classic charge of conspiracy" to frame someone simply "does not fit [the] mold" of intracorporate conspiracy doctrine); *Salto v. Mercado*, 1997 WL 222874, at *1 (N.D. Ill. April 24, 1997) (while a police department cannot conspire with itself when formulating policy, a charge that "a number of officers took concerted action to work together to harm" a plaintiff is "a classic charge of conspiracy"); *Williams v. Brown*, 269 F. Supp. 2d 987, 993 (N.D. Ill. 2003) (ICD does not bar suit for police abuses) . *See also Cannon v. Burge*, 2006 WL 273544, at *15 (N.D. Ill. Feb. 2, 2006) (same); *Howard v. Chicago*, 2004 WL 2397281, at *12 (N.D. Ill. Oct. 24, 2004) (same); *Hobley v. Burge*, 2004 WL 1243929, at *11 (N.D. Ill. June 3, 2004) (same).

For example, Judge Moran refused to apply the doctrine to a plaintiff's allegations of civil rights violations committed by police. "For the doctrine to apply, the members of the purported conspiracy must work in the corporation's interest. The deprivation of civil rights could not be a goal of Lake Zurich . . . The deprivation of civil rights is unlawful and the intra-corporate doctrine only applies when members of a corporation are jointly pursuing the corporation's 'lawful business.'" *Sassak v. City of Park Ridge*, 2006 WL 560579, at *9 (N.D. Ill. Mar. 2, 2006) (Moran, J.) (citations omitted); *see also Ramos v. Town of Cicero*, 2005 WL 1838334, at *3 (N.D. Ill. July 28, 2005) ("the weight of authority in this district has rejected the application of the intra-corporate conspiracy doctrine in cases involving allegations of police misconduct") (citation omitted).

**VII.   Defendants Are Not Entitled to Qualified Immunity**

Although purporting to argue in the alternative, Defendants' qualified immunity argument simply reargues the facts.  Plaintiff's claims are straightforward and arise out of well-established Fourth Amendment jurisprudence.  Defendants cannot seriously contend that they did not know that using excessive force against a passive resistor is prohibited by the Constitution.  Likewise, an arrest in the absence of probable cause has been unconstitutional for decades.  Qualified immunity is particularly inapplicable here because, for the obstructing charge, Defendant Davi knew that Plaintiff was not obstructing justice when he arrested him.[8]

**Conclusion**

For the reasons stated above, Plaintiff respectfully requests that this Court deny Defendants' Motion, with the exception of Plaintiff's Failure to Intervene Claim against Defendant Hilliard, Plaintiff Equal Protection Claim, and Plaintiff's *Monell* claims against the Village of Bolingbrook.

RESPECTFULLY SUBMITTED,

/s  
ATTORNEYS FOR PLAINTIFF

Arthur Loevy  
Jon Loevy  
Russell Ainsworth  
LOEVY & LOEVY  
312 North May St.  
Suite 100  
Chicago, IL 60607  
(312) 243-5900

---

[8] As for Defendants' assertion that there existed probable cause to arrest Plaintiff for the disorderly charge, if qualified immunity is a good faith

## CERTIFICATE OF SERVICE

      I, Russell Ainsworth, an attorney, certify that on August 14, 2008, I served this document by ECF electronic filing as to each party who is represented by counsel who uses electronic filing.

                                                <u>S/Russell Ainsorth</u>
                                                Attorneys for Plaintiff
                                                Arthur Loevy
                                                Jon Loevy
                                                Russell Ainsworth
                                                LOEVY & LOEVY
                                                312 North May Street
                                                Suite 100
                                                Chicago, IL 60607
                                                (312) 243-5900